Number 20-1610, Saleemvs.Corrections Officer Brungartetal, Ms. Dennehy and Mr. Kirkpatrick. Take your time, there's no urgency. Good morning. Good morning. My name is Joanna Dennehy and I was appointed as pro bono counsel to represent the appellant Mohamed Saleem. I'd like to reserve four minutes for rebuttal. You certainly may. This appeal presents two issues. First, the district court erred in granting summary judgment to the defendants on most claims based on Mr. Saleem's alleged failure to exhaust his administrative remedies. We submit that Mr. Saleem placed prison officials on notice of the pertinent issues raised in his federal complaint while exhausting his appeals of the finding that he had committed a misconduct. To the extent that raising those facts during the misconduct proceedings was not sufficient as a matter of law. Where is Mr. Saleem right now? Is he still in the country or out of the country? He's in the country. He is currently at an ICE facility in Pennsylvania. Okay. We submit that that has no bearing on the relief he's seeking in this case except for the injunctive relief that he saw, which we were already not pursuing on appeal. One of the big questions that I have when you get to it, if you could spend some time on it, is does 30 days in disciplinary housing detention definitively cause a years-long delay in his parole eligibility? That, to me, is key. Okay. I'm happy to address that now. Okay. Go right ahead. So, Mr. Saleem alleged in his complaint that the sanction of placing him in disciplinary confinement for 30 days delayed his eligibility for parole for several years. I realize that that sounds a little bit strange, given that he was in disciplinary confinement for 30 days. The reason that this occurred is because he is required, through his sentence, to complete certain programming before he can be released on parole. I didn't follow that very well. His detention, 30-day detention, delayed his parole eligibility for a lengthy period of time? I didn't get that number. Yes. So, per the prison policies, DC ADM 801, prisoners are not allowed to participate in programming while they are in disciplinary confinement. So, he lost 30 days. Is it just that he lost 30 days in connection with the classes he needs to attend, and so he's delayed 30 days? Or is it you're saying it's years that he's now delayed? Does he have to go back and start at zero? I just don't know what the facts are. So, the record is admittedly not fully developed on this issue. Mr. Saleem alleged years. Our understanding from our discussions with him is that it wasn't just a hiccup or a pause in his participation in this program. He was required to start over in some sense, such that it wasn't just a delay of 30 days. He kind of had to go back to the beginning. What supports that contention? Mr. Saleem's allegations in his complaint. Let's assume all that's true. Okay. In Pennsylvania, as I understand it, there's no liberty interest in parole or probation. So, isn't it not at the moment? Delay or no delay? Because, you know, one of the critical issues is where liberty interest. As I read the Pennsylvania opinion and in our circuit's opinion, there's no recognized liberty interest in probation or parole until you actually are on probation or parole. Correct. As a general matter, there is no liberty interest in being granted parole. However, we submit that the state can still create a liberty interest in being eligible for parole along the same lines as eligibility for good time credits created a liberty interest in both. What's your best authority for that proposition? Excuse me? What's your best authority for that proposition? The best authority from this circuit is Lemur. This is a case from New Jersey where a New Jersey statute essentially said that an inmate who is required to complete certain treatment as a condition of his sentence and where if he is not provided and does not complete that sentence, he automatically gets the maximum sentence that would be available under state law. The failure to provide him with that treatment gives rise to an actionable liberty interest. Okay. But Fantone, the third circuit case from 2015, 780F3-184, appears to say at 190 that you do not have a liberty interest. It says you do not have a liberty interest in. So Fantone involved a rescission of parole where the inmate was told he was going to get parole, then was I believe charged with a misconduct placed in the restrictive housing unit. The court accepted the idea that this misconduct was what led the board to rescind its parole, but the decision ultimately turned on the fact that that decision was discretionary. Because the board could rescind for really any reason and so therefore he had no protected liberty interest. We submit that this case is categorically different because we're not dealing with a situation where, we're not saying that this misconduct made it more likely that a board would deny parole, even though it probably would. We're saying that the misconduct made him categorically ineligible for a period of time based on the fact that he was not able to participate in this program. Extended the period during which he was not eligible for parole. That's the liberty interest you're focusing on? That's correct, yes. There's a Pennsylvania case that essentially supports what somebody might say Fantone supports, that it's called Weaver. How would you distinguish the Weaver case? It appears that it says that there's no liberty interest. Correct. And again, we're not claiming that, our claim is not that he was denied due process because he did not receive parole. We're in the universe of Wolf and Leamer where we're talking about a state-created obligation, I would say, for the prison to provide him treatment and for him to receive treatment. And so we just think that cases like Weaver and that aspect of Fantone are just not applicable here. Because we're not dealing with whether the state ought to grant him parole or whether it should exercise its discretion in his favor. We're dealing with an issue of whether he was categorically eligible. What was the treatment that you claim he was denied? He was sentenced for a sexual offense and required to undergo certain programming. How long is the program, roughly? I do not know. It's not in the record, and it's not clear from any of the extra record items that we were able to locate. And if he doesn't complete the program, he's not eligible for parole, is that correct? Yes, that is my understanding. There's a statute that essentially says that you cannot be released on parole in Pennsylvania until you complete. It's really more attenuated. He's not eligible for consideration for parole. Correct. It's even more attenuated. It's not like you complete the program, you get parole. You have to complete the program to even be considered for parole, right? It gets a little bit complicated because he was considered technically for – the parole board did consider him before this incident occurred, actually. But, you know, the fact that there are different – What was their reasoning for denying parole at that particular time? The district court cited several reasons. It cited – one was his inability or his failure to complete all required programming by that point. It also cited the fact that he wasn't – I can't remember all the factors. I'll confess. But they're set out in the defendant's brief. But, I mean, so – But one of the reasons initially that he had not yet completed the educational component of this – Correct. Education. They did cite that in that decision. So if I may turn to exhaustion briefly just because I see I only have – No, you're fine. You have our time. Go ahead. So we submit – the district court erred in relying solely on the fact that Mr. Salim filed only one grievance in this case and named only one of the defendants. We submit that that was plainly error. The prison policies very clearly say that if you want to raise issues concerning the handling of a misconduct, the conduct of a misconduct hearing, you can only do that through the DCADM 801 procedures. And so Mr. Salim did exactly that. He fully appealed his – the hearing examiner's finding that he had committed misconduct. And so we submit that was sufficient to – certainly to exhaust all claims against all prison officials who were involved in the process of reviewing his appeals. We also submit that that was sufficient to exhaust his claims with respect to retaliation, with respect to deliberate indifference to health and safety and his free exercise claim, equal protection claims. In all of those cases, Mr. Salim raised the salient details to prison officials. He said that he had been a victim of bias. He said that he had been attacked by another inmate and that he had repeatedly called for help. And most importantly, he alleges in his federal complaint that he submitted an affidavit from his cellmate that provided ample detail about the incident, including details that Mr. Salim did not personally possess at the time he appeared before the hearing examiner. These included details such as prison guards actively refused to come to Mr. Salim's aid, used really disgusting derogatory language in explaining why they were refusing to come to his aid, and then also that his cellmate had been threatened with retaliation if he helped Mr. Salim. So we think that that created a—at least put the prison officials on notice that he sought to raise these issues. I see my time has expired, so I will be back on rebuttal. Thank you very much. Mr. Kirkpatrick. May it please the court. My name is Sean Kirkpatrick with the Pennsylvania Office of Attorney General here on behalf of the appellees, and there are two points that I need to discuss this morning to clear up some confusion. And let me begin with where this court began, and that is the liberty interest. This case is fantone, not liberty. And the reason is, as this court recognizes, is that in Pennsylvania inmates have no right to parole. Now, in Lamar, the court was dealing with a very unique statute under New Jersey law, which pretty much created a hybrid for sex offenders that said, okay, well, you can be placed in prison, but you can also be placed in treatment. And you can't have any kind of parole, good credits, or anything unless you finish treatment, because this is about treatment. And the unique facts of that case was the inmate alleged that he was being denied treatment because he wasn't complying with the treatment, and therefore couldn't get into treatment because he wasn't. And it was this horrible catch-22. Here in Pennsylvania, first of all, we don't have that kind of hybrid structure, but second of all, there is a, certainly a statute that requires Department of Corrections to provide sex offender treatment to certain sex offenders. And as we discussed in our brief, and I believe my friend concedes in their brief, that doesn't apply, that law doesn't apply to Mr. Salim. What they rely upon is Section 6137 of Chapter 61, and I want to just read some key language so we can understand what it says and what it doesn't say. Because it does not say that Mr. Salim must be given treatment. This is dealing with the criteria for parole. It says, if the primary reason for not paroling the offender is the offender's inability to access and complete prescribed programming within the correctional institution, the board may release the offender on parole with the condition that the offender complete the prescribed programming while on parole. That's Subparagraph 1. Subparagraph 2 makes an exception to that allowance for Chapter H sex offenders. And then Subparagraph 3 makes an exception to that exception. For those offenders to whom Subparagraph 2 is applicable, the board may release the offender on parole if the offender is subject to another jurisdiction's detainer, warrant, or equivalent writ. As my friend explains to the court today, that Mr. Salim is currently in detention by Immigration Control and Enforcement. As the part of the Mr. Salim in his brief uses the Pennsylvania Commonwealth Court case of Salim versus Pennsylvania Board of Probation and Parole, which we both cite, to demonstrate that he is, in fact, a Subchapter H sex offender. That same case also establishes that he was engaged and subject to immigration proceedings during the pendency of his sentence. Now, what this doesn't say, and what makes this different than Lamar, is you must give sex offender treatment to Mr. Salim. Practical reasons, most likely a sexual violent predator will be analyzed and probably given some kind of treatment while in Department of Corrections custody. But the law, Pennsylvania law, does not create the weird, unique set of circumstances that were in New Jersey in that prior case. This is Fantone. It is not Lamar. If I can go to the interplay between 801 and 804. What else, which dovetails with exhaustion, what else could Mr. Salim have done to exhaust his claims? What Mr. Salim should have done, and in fact under the PLRA must do in order to exhaust, is to file a grievance about what he alleges was an attack, an attempted murder on his life. He says in his complaint that two guards conspired with an inmate to attack him. He fought them off and they sprayed him with OC spray and then they took him down to medical and didn't give him any treatment. Now, under, as we described, 804, so 801 and 804 are two different tracks. 801 deals with misconducts and appeals of misconducts. 804 deals with grievances, all other kind of grievances. And in 804, this is page 1-2, 804 says you are to use 804 to grieve any complaint except for the following five. A specific misconduct charge, conduct of a misconduct hearing, statements written within a misconduct or other report, a specific disciplinary sanction, and the reasons for placements in administrative custody. Those are the only things that you must use 801 or in certain cases 802 to appeal. Everything else must be 804. Now, in this situation. But wasn't this in some way related to, has to be related to the misconduct charge. Everything stemmed from the incident in the cell that night when supposedly the person threatened the life of Salim. So my thought is that if he had filed a grievance right away, the prison would just have denied it and advised him to raise it, complaints in the disciplinary appeal. No, Your Honor. And the reason I say that is, one, 804 says you cannot bring an issue, it doesn't say related to, it's about a specific misconduct charge. You cannot say I got this misconducted properly. All of the things that happened, so let's say everything happened exactly as we say, but there was no misconduct. Well, 801 is now blocked because there's no misconduct to grieve. But 804 would apply because it would apply in both circumstances. So we have a district court, and this is why this is not McBeth v. Grimsby. We have a district court that did the Smith fact finding, found that these two paths were open to him. There's no evidence that there is some kind of broad policy that any time it even smells of a misconduct, they reject it. If that was the case, we would be under different circumstances. And under 804, I will note that when a grievance is rejected for any reason, the inmate has five working days from the notice of the rejection in order to resubmit it. That's addendum 53. So what Mr. Saleem was required to do is, in the first instance, make any kind of complaints he has about the misconduct charge and the proceedings of the hearings through 801, but simultaneously, and he did file a grievance simultaneously, simultaneously file an 804 grievance that says, I was attacked, the guards opened the door so I could be attacked, I got hit with O.C. spray, I wasn't given medical treatment. The five working days, interestingly enough in this case, so... Did he file a grievance? That would have been five working days after his grievance was rejected. So he files a grievance in which he raises exactly what he's not allowed to raise, which is, this officer lied in my misconduct report. It was rejected. He did that under 804? He did that under 804. He should have done it under 801. Yes, he should have brought it up through 801, but he should have instead filed, refiled it within five working days, and this would have been well after his cellmate signed his statement providing all this detail he now wishes to rely upon. He needed to excise the idea that I'm challenging this specific misconduct, and what he needed to grieve is, guards are attempting to murder me, or I was excessive force, or I'm not getting medical. You're saying he didn't do that. He did not do that, Your Honor. He should have. That's exactly what I'm saying, Your Honor. Now, with regards to the misconduct itself, then there is obviously appeals process. The district court found that he had exhausted as to one claim against Officer Brunard. What he didn't do, as we discuss in detail in our brief, is raise anything else about not being able to view a video, or not being able to present video during the hearing, misconduct hearing, or any other allegations against anyone else. There are two tracks, and there are two trains, and you cannot mix and match, and you cannot jump from one to the other, and the sin qua non of the exhaustion requirement is to give the prison notice that there's an issue out there, and to allow us to fix that before it results in a federal lawsuit. And to do that, what we're asking is, because 801 and 804 are different tracks, the people in the review process are not necessarily the same people. One would think, if you file under 801 or 804, the prison's on notice. So why burden a system with these parallel tracks? Because, Your Honor, they, first of all, do two separate, they handle two separate kind of complaints. And it's different people in the administration? Yeah, there are different people. And the, again, it becomes sort of a, kind of like a respondent superior argument when you say that if one guard has notice of something, then instantaneously every other member of the prison has that notice. That's unfortunately not the way it works. There are a lot of misconducts, there are a lot of grievances, and 801, how I conceptualize it, 801 is the criminal docket, 804 is the civil docket. And just as you can't bring a habeas in the civil docket, and you can't bring a tort in the criminal docket, you can't do that here. We've established two systems that go to different people. And the final review, frankly, is a different person. With misconducts, 801 is the chief hearing examiner who's outside of the prison. He's in Mechanicsburg. And then for 804, it's the secretary's office. So what the policies require, and what we don't believe is too onerous, is if you're attacked, if you're denied medical treatment, you say that. You say that in a grievance. If you think that a hearing examiner didn't do X, then you say that through the 801 appeal process. And we're not saying that you cannot exhaust your administrative remedies through 801. You absolutely can, but you can only exhaust those issues that are permitted under 801. If the court does not have any other questions. I have no further questions. Thank you. Thank you, Your Honor. Thank you. I want to address a few points that came up during my colleague's argument. First, he discussed Lemur at length. This is that New Jersey case involving a certain treatment program. We disagree. We don't think that Lemur is distinguishable on its facts at all. Mr. Saleem, there's no dispute that he was required by his sentence to complete certain treatment while incarcerated. But in the end, you've got to show that this is what happened to him as atypical and significant hardship. And usually what you see is 30 days, certainly not being atypical, you have to put a tail on it, and that is that it caused him for a long period of time not to be eligible for consideration before a parole board. Isn't that correct? That's correct, Your Honor. And you're saying that the record is kind of mushy, I guess, in terms of what really is out there as to how long 30 days truly delayed him. That's right. And to be honest, it's because this issue was not addressed at all below, even though Mr. Saleem did raise it in his complaint. I think also, just putting Lemur aside, there's another way for us to get there that we set out in our papers, and that is that when an inmate claims retaliation or that a misconduct charge was fabricated, under Smith v. Mencinger, this court's precedent, he's entitled to some process. It's not clear from that opinion, to be frank, whether that is the wolf process or something less than that, but at a minimum, he's entitled to an opportunity to defend himself against the charges. And so we submit here that if all that you get is an opportunity to walk into a hearing examiner's office when the person accusing you of misconduct doesn't himself show up, you get no witnesses, the hearing examiner allegedly refuses to look at surveillance videotape, that's not really an opportunity to defend yourself. The deck is totally stacked against you at that point. So we'd submit that regardless of whether the full wolf protections apply here, the prison was required to do more in this circumstance. What do you suggest should have done or should have taken place? Well, I think he... You say this was to allow him to explain, essentially, the circumstances and what happened. Yes, so... At a minimum, the hearing examiner should have given him an opportunity... Well, one should have reviewed the surveillance videotape once he orally requested it at the hearing. We pointed to evidence in the record that the tape still existed at least a month later, and so there's no evidence that it was unavailable. So at least the record as it currently stands is that he asked and she didn't review it. So he made a request that the video surveillance tapes be actually viewed, and you're saying, though available, nobody took the time to see what actually happened. Yes. This is in connection with the... I wouldn't say a fight, but they had... Physical altercation. Physical altercation, I suppose. Correct. So he made the request, and it doesn't appear that anyone ever looked. And also, I mean, I think given what his cellmate set out later in his statement, I think it would have been important to allow the cellmate to testify. I mean... See, I'm almost out of time. And so... We respectfully request that the court remand to the district court for further findings because we believe what the district court did here was insufficient with respect to both extortion and the merits of Mr. Saline's claim. Thank you. Thank you very much. Thank you for taking this matter pro bono. When were you appointed to take the matter on? We were appointed in the summer of 2021. Okay. Well, thank you, and thank you as well for being with us. Both you and... Your name is? Jessica Rothschild. Thank you. It's... I hope you come back again. And it's... It does us well to be...